2023 IL App (2d) 220413-U
No. 2-22-0413
Order filed August 30, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| ROBERT INGOLD, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 18-L-0591 |
| | ) | |
| THE CITY OF GENEVA, STATE BANK OF | ) | |
| GENEVA, as Trustee under Trust #1010, and | ) | |
| PHILLIP HAHN, d/b/a Hahn's Bakery, | ) | |
| | ) | |
| Defendants | ) | Honorable |
| | ) | Robert K. Villa, |
| (State Bank of Geneva, Defendant-Appellee). | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Presiding Justice McLaren and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court properly granted summary judgment in favor of defendant and against plaintiff. The defendant landowner did not have a duty under either applicable municipal ordinances or common law to maintain the public parkway abutting its property. Defendant did not own, maintain, or actively place the defect that allegedly caused plaintiff to trip, fall, and sustain injury. Therefore, we affirm.

¶ 2    Plaintiff, Robert Ingold, appeals from an order of the circuit court of Kane County granting summary judgment in favor of defendant, State Bank of Geneva, as Trustee under Trust #1010,

stemming from an injury he sustained after tripping and falling while traversing a public parkway adjacent to defendant's property. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      This case arises from a premises liability complaint plaintiff filed after he fell and was injured on the night of May 12, 2018, as he exited a parked car in front of his apartment. The complaint alleged that his injuries were caused by the failure of defendant to mow the grass on a City of Geneva-owned parkway adjacent to plaintiff's parked car and perpendicular to defendant's property.[1] The parkway is approximately the length of a parking space and about four to five feet wide. Plaintiff allegedly stepped backwards onto the grassy parkway after exiting the car, caught his foot under a raised water valve, commonly known as a "buffalo box," and fell as he tried to turn forward towards his apartment.

¶ 5      Count II of plaintiff's amended complaint alleged that defendant was the trustee under a land trust at 303 Franklin Street in Geneva and was a community bank located in the city. Plaintiff claimed that defendant had a duty to exercise ordinary care to keep the parkway located at 303 Franklin Street in a reasonably safe condition for pedestrians. Plaintiff alleged defendant was negligent due to one or more of the following:

_____

[1] The circuit court granted defendant City of Geneva's (city) motion for summary judgment on count I of plaintiff's amended complaint, finding the city had no actual or constructive notice of a dangerous condition under section 3-102 of the Illinois Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/3-102 (West 2020)). The court also terminated defendant Philip Hahn, d/b/a Hahn's Bakery, as a respondent in discovery by agreed order. Accordingly, the city and Hahn are not parties to this appeal.

"a. Chose to allow grass on said parkway to remain un-mowed although said grass was greater than 8 inches in height, thereby constituting a safety hazard and nuisance under City of Geneva ordinance 8-5B-2(A);

b. Chose not to timely and properly cut the grass for the parkway, in violation of City of Geneva ordinance 8-5B-2(B);

c. Chose not to make a reasonable inspection of the parkway to discover and remedy whether the water valve or curb stop on said parkway was obstructed or hidden in any way by the tall and un-mowed grass;

d. Chose not to safely and properly maintain the condition of the subject parkway;

e. Chose not to warn invitees of said dangerous and hazardous condition that existed on the aforesaid parkway; [and]

f. Chose not to timely and appropriately remedy the dangerous and hazardous condition that existed on the aforesaid parkway."

¶ 6 The pertinent portions of the city's municipal code as alleged in plaintiff's complaint provide:

"8-5B-2: MAINTENANCE:

A. Height Restrictions: It shall be unlawful for any person to permit any weeds, grass or plants, other than trees, bushes, flowers, prairie grass or other ornamental plants, to grow to a height exceeding eight inches (8") anywhere in the city. Any such plants or weeds exceeding such height are hereby declared to be a nuisance. (1975 Code § 24-39)

B. Requirement To Maintain Area From Property Line To Curb Or Pavement Line: It shall be the responsibility of the property owner to cut the grass, weeds or plants

3

located in the area between their property line and the curb line or pavement line of the street abutting or immediately adjacent to their property. (Ord. 2005-53, 11-7-2005)." City of Geneva Municipal Code § 8-5B-2 (Subsection A eff. 1975 and subsection B eff. Nov. 7, 2005); see also https://library.municode.com/il/geneva/codes/code_of_ordinances?nodeId=TIT8P UWAPR_CH5FO_ARTBPLWE_8-5B-2MA.

¶ 7 Plaintiff alleged that as a direct and proximate result of one or more of the foregoing negligent acts or omissions by defendant, he suffered severe, permanent, painful, and disabling injuries that interfere with his everyday activities, and also caused him to incur medical expenses and lost wages. In its answer to plaintiff's amended complaint, the city admitted that "it maintains a buffalo box water shut-off valve located in the parkway at 303 Franklin Street."

¶ 8 On May 26, 2022, defendant moved for summary judgment, arguing that it owed no duty to plaintiff for the condition of the parkway. Defendant argued that, although the city's ordinance required adjacent landowners to cut and maintain the parkway grass, the ordinance did not create a duty of care to benefit plaintiff, because it is a regulatory provision intended only to benefit the municipality. In addition, the parties did not dispute that the parkway was owned by the city and that defendant never possessed or controlled the parkway in question. The parties also did not dispute that the city owned and controlled the buffalo box that allegedly caused plaintiff to trip and fall. Defendant contended there was no evidence that either it or its property manager, Coleman Land Company, had any knowledge or information prior to the incident, that the buffalo box existed on the parkway, or that it was raised and created a potential hazard.

¶ 9 Defendant also argued that there was no evidence showing that it performed any acts to suggest that it intended to control the parkway or prevent others from using it. Defendant further

contended that the parkway was never utilized as a means of ingress or egress to the property at 303 Franklin Street and that there were multiple ways to access the building without traversing the parkway in question. Finally, defendant argued there was no evidence that, on or prior to the incident, defendant or Coleman Land Company maintained the parkway or buffalo box, cut or mowed the grass on the parkway, parked vehicles on the parkway, stored objects on the parkway, or otherwise controlled or used the parkway in any way, or prevented the public from using it. Defendant attached exhibits to its summary judgment motion, including pertinent deposition testimony as follows.

¶ 10    Plaintiff testified that he resides in the apartment located at 303 1/2 Franklin Street, above Hahn's Bakery, and had lived there for nearly seven years prior to the incident. When asked what his understanding was regarding who maintains the parkway, plaintiff responded, "I've never known who has done it. I was always at work when it was cut, mowed, maintained." In the entire time that he had been residing in the apartment above the bakery, plaintiff stated that he could not "recall ever walking through" the parkway at issue. He likewise had never seen the buffalo box in the parkway prior to the incident. Plaintiff testified that he never complained about the condition of the parkway or the raised buffalo box to the city before his injury.

¶ 11    Plaintiff identified a photograph of the area where he fell. He described an internet photograph image of the street view of 303 Franklin Street. Plaintiff stated that the photograph accurately depicted public parking spaces on the street in front of 303 Franklin. He did not have a designated parking space in front of the building. Plaintiff would park in one of the parking spaces at 303 Franklin when available.

¶ 12    Plaintiff next described the events leading to his fall. At about 9:30 p.m. on May 11, 2018, he parked his girlfriend's car in the public parking space immediately adjacent to the parkway. He

and his girlfriend had returned from eating dinner at a restaurant. The vehicle was parked with the front windshield facing the building at 303 Franklin. The parkway was adjacent to the passenger side of the car. A utility pole with a streetlight was also located on the parkway, providing an amber-colored light that plaintiff described as "not a really bright light."

¶ 13    At midnight between May 11 and May 12, plaintiff returned to the car to retrieve some items in the back seat. He testified that he opened the rear passenger door, "grabbed my items, stepped backwards up onto the grassy area, shut the door, turned to go back inside. My left foot went under the buffalo box *** and stayed under it, as my body turned to go back upstairs, and that's when it all happened, and I fell down." Plaintiff acknowledged that he sent a text communication to his employer following the fall, in which he stated that he had tripped over a water shutoff valve "that is 3 inches off the ground in 12 inches of grass."

¶ 14    Plaintiff testified in further detail that he had parked the car to center it in the parking space that night. When he approached the car at midnight to retrieve some items, he had stepped between the curb and the car and did not walk on the parkway when he opened the rear passenger door. He retrieved a jacket and paper bag from the back seat and stepped backwards onto the parkway with his left foot. When plaintiff stepped back from the car he did not look down at the grass. He was still facing the passenger side of the car at that point. When asked where he was looking as he stepped away from the car, he stated, "[s]till towards the car." Plaintiff stated that he backed up and flung the car door closed with his free hand, turned to go inside, "and that's when it all happened." According to plaintiff, "[i]t was all one movement, like getting out of a car." He also had stepped backward with his right foot to back away from the car. When asked where he was looking once both of his feet were on the parkway, plaintiff responded, "Probably the direction I'm going to go, towards my door." The following colloquy ensued:

"[DEFENSE ATTORNEY:] So you would have turned and looked towards the alleyway where your entry into the building is?

A. Correct.

Q. And then you stepped forward with your left foot then?

A. I stepped forward with my right foot. My left foot was under the buffalo box, unaware to me.

Q. So had you – From the time that you had stepped backwards the first time into the parkway with your left foot, is it at that point, in hindsight now that you realized that you were – your foot was underneath the buffalo box?

A. I didn't know my foot was under it.

Q. Do you know now whether or not your foot was under it?

A. I'm sure of it now.

Q. So it was at the moment – You would have stepped over the buffalo box and the front of your foot was underneath it or how was your foot underneath it?

A. I think I stepped right next to it with my left foot. My right foot was however far away your right foot is. I shut the door, and when I turned, my foot, I believe, went under the lip of the thing, and I was stuck.

Q. So as you attempt to step forward, is that when you fall?

A. I wasn't attempting to step forward. I was attempting to turn myself around to head towards – back to my building to get out of the way of the car door and head inside.

Q. At any time prior to the point where you noticed that your foot was caught under the buffalo box, did you look at the ground?

A. I didn't know my foot was caught under the box until I turned and it all happened.

\*\*\*

Q. You didn't look at the ground until you were already falling; is that right?

A. I'm not sure if I ever looked at the ground. It all happened so fast."

¶ 15    Plaintiff testified that he fell on his left side between his hip and knee, and then rolled onto his back to stand up. He heard a popping sound emanating from his knee as he fell and described the event as very painful. No one else witnessed the fall. Plaintiff drove himself to the hospital for treatment using his work vehicle, returned to his apartment at approximately 5 a.m., and called the police to file a report regarding the incident. The police report states that "[t]he valve in question is painted blue and the grass around it had not been mowed. It, however, is visible." Two photographs of the parkway included with the report depicted the condition of the parkway and the buffalo box as they appeared at 5:40 a.m. on May 12, 2018. Plaintiff testified that the photographs accurately depicted the condition of the parkway and buffalo box immediately after the incident. Plaintiff acknowledged that the photograph of the parkway showed that the buffalo box had blue paint on it and was "clearly visible in the photograph."

¶ 16    Plaintiff testified he had observed that the grass on the parkway was tall and uncut a few weeks prior to the incident. When asked if he talked to anyone about the length of the grass before he fell, plaintiff responded, "[n]o. I don't care." Plaintiff did not complain about the tall grass on the parkway to his landlord, to Hahn, or to the city. After he sustained the injury, plaintiff spoke to Hahn, who told him that he had complained to the city about the 14-inch tall grass on the parkway "that made his business look horrible." They did not discuss the presence of the buffalo box or its protrusion from the grass in the parkway.

8

¶ 17     Plaintiff testified that he had torn the meniscus in his right knee after slipping and falling on ice in January 2018. He did not have surgery to repair the torn meniscus in his right knee, but had received a cortisone injection. The fall on May 12, 2018 resulted in a torn meniscus in plaintiff's left knee, which required surgery. Plaintiff's surgeon provided him with a note allowing him to return to work on June 12, 2018. Plaintiff had surgery to repair the torn meniscus on June 20, 2018. After he completed physical therapy, he received cortisone shots in his left knee. He stated that he still has swelling and pain in his left knee.

¶ 18     During questioning by defense counsel, plaintiff testified that when he stepped backwards after retrieving the items from his girlfriend's car, he did not look over his shoulder. Plaintiff stated that he did not look where he was going as he stepped backwards and that was when his foot got caught under the buffalo box. Counsel asked, "Is it true that you did not look back before you stepped back, you did not look at the grass?" Plaintiff responded, "No, I didn't." Counsel again asked plaintiff whether he "look[ed] at the grass at any point prior to *** tripping over the water valve." Plaintiff answered, "no."

¶ 19     Plaintiff also executed an affidavit on June 27, 2022, in which he stated that the morning after his injury, he took photographs of the subject parkway. He averred that the height of the grass on the parkway measured as tall as 15 inches and the buffalo box was raised three inches off the ground. He stated in his affidavit that the tall grass from the photograph "accurately depicts the hidden or concealed appearance of the raised buffalo box top in the parkway that caused me to be injured."

¶ 20     James Coleman, Jr. testified by deposition that he is one of the owners of Coleman Land Company, which manages, leases, purchases, and sells real estate for its clients. In 2018, Coleman Land Company managed the property located at 303 Franklin Street. A beneficiary of the trust

contacted Coleman to manage the building. Coleman's company had entered into a written management agreement with defendant to manage the property in 2015. Coleman testified that, other than the parkway in front of the building, there was no other grass located on the property. Coleman stated that he "had not contracted for this small strip of land to be mowed" before the incident. Prior to plaintiff's injury, Coleman was not aware of whether anyone had mowed the grass on the parkway. He did not recall any communication with Hahn requesting mowing or maintenance of the parkway. Coleman stated that perhaps Hahn had mowed the parkway, but he was not sure. In addition, Coleman did not receive any requests from plaintiff to mow or maintain the parkway. To his knowledge, other than a potential conversation with Hahn, Coleman did not receive any complaints or have any conversations with anyone about the parkway at 303 Franklin prior to the occurrence in this case. After the incident occurred, Coleman contracted with a lawn maintenance service to mow the grass and maintain the weeds.

¶ 21    Coleman testified it was his understanding that property owners maintain the parkways. When asked why Coleman Land Company performed no maintenance of the parkway prior to the incident, Coleman responded, "[i]t was unintentional and *** I did not contract to have it mowed." Coleman repeated that he was responsible for maintaining the parkway. Coleman acknowledged that the city had no obligation to mow or maintain the parkway, "other than the water valve." He also stated that, as for the raised buffalo box, which he observed after the incident occurred, "[t]he city should have come [to] fix it so it's not up, raised up." Coleman explained that in his experience, when the ground freezes and thaws, the water valves tend to get pushed up and the municipality is responsible for lowering them. Coleman had no personal knowledge as to why the buffalo box was raised three inches off the ground.

¶ 22    Coleman also executed an affidavit, in which he averred that from 2015 through May 11,

2018, "neither Trust #1010 nor Coleman Management Company controlled, blocked, placed objects/items, stored objects/items, utilized or prevented the public from using the parkway in any way." He also stated that "ingress and egress to the property at 303 Franklin, Geneva, IL was accessible without crossing or otherwise utilizing the parkway in question via the public sidewalks and private walkways and driveway." Finally, Coleman averred that from 2015 to May 11, 2018, he was "not aware of any maintenance, repair, work, or lawn care done on the parkway by or on behalf of Trust #1010 or Coleman Land Company."

¶ 23    Hahn testified by deposition that the grass on the parkway "has been an eyesore," and that he was never happy with its appearance. He owned the bakery at 303 Franklin since 2002 and rented the storefront. He stated that the grass on the parkway "was always neglected," even with the building's prior owner. Before plaintiff's injury, "Mr. Simon's crew [from another building management company] would -- in order to make the town look a little prettier, they would sometimes come by and cut back the growth," but generally, no one mowed the grass on the parkway. Hahn spoke to Coleman about the lease and it was clear to him that Hahn was responsible for snow removal and that Coleman was responsible for maintaining the outside of the building.

¶ 24    Hahn looked at the photographs of the parkway taken immediately after the incident and stated that "[i]t has looked worse than this. This is not even that bad, yeah." Hahn acknowledged that he had not complained about the condition of the parkway to Coleman before the incident involving plaintiff. Hahn stated that one time, he spoke to someone from the city about the condition of the parkway, but only after plaintiff fell. He spoke to "a young man that was doing maintenance on Third Street, and he said it's not something he was allowed to do." Describing the parkway in front of 303 Franklin, Hahn stated that "people walk their dogs there, obviously, and the kids are always running around. It's that type of town. There's always people moving around."

Hahn was unaware of the raised buffalo box on the parkway before he learned of plaintiff's injury. He stated that the water valve was "[n]ot something that I would complain about" to the city. As far as he was aware, no one had ever tripped on the buffalo box as long as he had been a tenant of the building.

¶ 25    Hahn had spoken to plaintiff the morning after the incident and asked him what had happened. Plaintiff told Hahn that "he lost his footing and that he had to be taken away in an ambulance." Hahn later clarified that plaintiff told him that he tripped, but did not specifically mention the water valve. Plaintiff told him only that "he lost his footing and tripped." As to what plaintiff had tripped on, Hahn stated that plaintiff did not mention anything and that "I don't think [plaintiff knew] what he tripped on at first. There's lots of different things to trip on." Hahn further explained that, "I think because it was so late at night and so dark out, I think the priority was getting him some medical attention *** the conversation was slanted more towards not what he tripped on but how injured he was at the time and if it was going to prevent him from working."

¶ 26    James Forni had served as the city's code administration officer for 24 years. His duties include routine patrol of the city's neighborhoods to look for property maintenance issues. Forni stated that "maintenance issues" include a collapsing deck, house painting, weeds, bushes obstructing a city sidewalk, and zoning issues for uses of yards. Forni was familiar with buffalo boxes, but he had never seen one raised off the ground, unless it was on the grounds of a new development and had yet to be lowered for final grading of the property. Forni testified that he did not find any violations of city ordinance 8-5B-2 for failure to maintain the parkway at 303 Franklin Street. In the 24 years Forni has served in his position, he described the circumstances for enforcing violations of that ordinance:

"Eight inches *** the issue is that weeds grow at different rates than grass. So, I

mean, the grass could only be four inches, it's got a couple of weeds that are eight inches. Is that going to trip a notice? Probably not. If the entire yard is 14 inches and waving in the wind, then that is going to obviously qualify."

¶ 27 Forni also explained that the ordinance previously had a 12-inch cap on height that was reduced to eight "probably" due to "aesthetics." When asked whether grass higher than eight inches should be considered a safety hazard for individuals, Forni responded that it is not because "the vast majority of the complaints we get in are from people concerned about mice and snakes hiding in any grass over eight inches tall." He stated that if a homeowner has grass 12 inches tall, he is not happy, but eight inches as a threshold is not problematic "until it's clear that they're not taking care of it." When asked if he had seen the grass as depicted in photographs of the parkway at 303 Franklin before plaintiff's injury and whether he would issue a letter of notice for violating the ordinance, Forni responded that he would have made some attempt to contact the abutting property owner, but also stated, "it's not egregious, at least based on the photos themselves." Finally, Forni acknowledged that it is the property owner's responsibility to mow the parkway so that it conforms with the city's nuisance ordinance.

¶ 28 Robert Van Gyseghem testified by deposition that he has served as the city's superintendent of water and wastewater for 16 years. He previously served as a water and sewer maintenance worker and stated that he was familiar with buffalo boxes. Van Gyseghem explained that buffalo boxes allow the city to shut off water going to the property instead of having to go inside the property to turn off the water valve. He also stated that buffalo boxes distinguish between private and public property "as far as who is responsible for maintenance of that service line underneath the ground." When buffalo boxes are installed on a property, the goal is to adjust the box so that it is flush with the ground, which is accomplished by "pushing them down" using either

full body weight or a sledgehammer. Van Gyseghem confirmed that the buffalo box at 303 Franklin Street is owned by the city. He also explained that a buffalo box raises up off the ground due to "the frost heaving it up," meaning that, when the ground freezes, the area can be raised due to the freeze/thaw cycle. The buffalo box is not a spring-loaded device and instead must be manually pushed back down. The city has no written policy or procedure requiring the buffalo box to be flush with the ground, or any particular height requirement or limitation for buffalo boxes.

¶ 29     On August 1, 2022, the circuit court heard argument on defendant's summary judgment motion. The court initially stated its understanding of the facts and plaintiff's theory of the case that defendant owed a duty to mow the grass on the parkway. The court stated, "the essence of the complaint in this case is that the Trust has a responsibility to mow the grass so that any buffalo box that might have risen out of [the] ground based on thawing or whatever reason *** would be visible." Plaintiff agreed that the court accurately stated his theory of the case, stating that "the defective condition is the combination of the tall grass obscuring the raised buffalo box."

¶ 30     The circuit court then addressed the application of the city ordinance requiring landowners to mow public areas adjacent to their property when the grass is taller than eight inches. Plaintiff's counsel agreed that under the ordinance, grass taller than eight inches is a nuisance. The court found that the ordinance "is more of an appearance-type benefit for people *** that use the area and the surrounding property owners, rather than a safety issue." Plaintiff reiterated that the length of the grass should be considered a safety issue. The court then asked, "[h]ow does eight inches establish a safety issue when four inches would have obscured this particular buffalo box if it was supposedly three inches raised above the ground?" Plaintiff responded, "I think if it was four inches and it was obscuring the buffalo box, I am not citing to that ordinance at all. I am strictly following the common law duty that's addressed more in *Thiede*, *Repinski*, and *Burke*." Plaintiff argued that

he cited the ordinance because a nuisance can cause harm to others and potentially created a responsibility under the ordinance. Then plaintiff stated, "I think the stronger argument is that there is a common law duty set forth in *Thiede*." The court found that the ordinance did not create a duty "whether it uses the word 'nuisance' or not." The court explained, "I would think they really do it for what I imagine is a cosmetic look or reason because they don't make any other reason that an adjacent landowner would otherwise be responsible for assisting the City of Geneva."

¶ 31    Next, the circuit court addressed the issue of whether defendant owed plaintiff a common law duty to maintain municipally-owned property. The court stated there was no evidence that, prior to the incident, anyone had knowledge that the buffalo box was raised three inches off the ground or that a landscaping company had trimmed the parkway so that the raised buffalo box was visible. Plaintiff's counsel specifically stated "[t]here is nobody that admitted to mowing that area for about three years before this incident." Plaintiff cited *Thiede v. Tambone*, 196 Ill. App. 3d 253 (1990) in support of his argument, contending that he raised a genuine issue of material fact regarding whether defendant caused or contributed to the defective condition of the parkway. Plaintiff's counsel specifically pointed to Coleman's admission that he was responsible for mowing the grass on the parkway and failed to do so. Plaintiff's counsel argued "[t]he defective condition is the obscured raised buffalo box because of this tall grass that in some places is 15 inches high." According to plaintiff's counsel, "[i]t is the combination of the two that created a hidden hazard." Defense counsel responded that it did not cause the defect to occur, which in this case was the raised buffalo box, not the length of the grass. Defense counsel admitted that if the tall grass was a defect, they failed to mow or cut the grass.

¶ 32    After hearing argument from the parties, the circuit court again stated that the common law duty at issue was whether "the failure to do anything under the ordinance after the eight-inch height

[of the grass] has been reached allows for any defective condition that might be on the property to be obscured." Defense counsel responded that it was midnight at the time of the incident and that plaintiff never looked where he was stepping and, therefore, would have never even seen the raised buffalo box, with or without tall grass. Defense counsel argued, "grass or no grass, there is no evidence from the plaintiff at all that he was looking or would have seen down what was at the ground because he was coming to the car, grabbing something, turning around backwards, stepping. He says he never looked, never saw it, never looked down. So I think that is a red herring at the end of the day." The court then framed the issue of legal duty again, asking whether "[i]ndifference is the same as action," and took the motion under advisement.

¶ 33    On October 21, 2022, the circuit court issued its written decision granting summary judgment in favor of defendant and against plaintiff. First, the court found that the city ordinances at issue did not contain any express language imposing tort liability to third parties for violations of their requirements. The court stated that, "because the ordinance requires adjacent property owners to maintain the grass on parkways and other common public areas below a certain height, it is intended to benefit the municipality and is not a public safety measure."

¶ 34    Next addressing whether defendant owed a common law duty of care, the circuit court found that plaintiff did not claim defendant assumed control of the parkway for its own use at any time and, because plaintiff failed to show that defendant appropriated the parkway for its own purposes, defendant could not be held liable for its condition. The court also held that no duty arose on the part of defendant because it did not actively cause the dangerous condition on the parkway, namely, the raised buffalo box that plaintiff claimed caused him to trip and fall. The court found that "[d]efendant had no responsibility for knowledge of a defect owned by the city and located on the city's property. Moreover, the presence of leaves or grass around a defect on a

parkway does not make it an unreasonably dangerous condition." Finally, the court determined that defendant did not actively place the buffalo box in the parkway or engage in any act that would have caused the buffalo box to rise above ground level. The court concluded that "because defendant did not actively create or contribute to the defect that injured Plaintiff, Defendant did not owe a duty to him based on this premise." Plaintiff timely appealed.

¶ 35                                    II. ANALYSIS

¶ 36     On appeal, plaintiff argues that the circuit court improperly granted summary judgment in favor of defendant and against him. He contends that, under city ordinances 8-5B-2A and 8-5B2B, defendant owed him a duty not to create a nuisance by allowing the grass on the parkway to grow in excess of eight inches. Plaintiff also argues that defendant owed him a common law duty to refrain from causing a defective condition in the parkway because the tall grass that defendant failed to mow concealed the hidden defect, the raised buffalo box. We address both issues in turn.

¶ 37                               A. Standard of Review

¶ 38     Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). Summary judgment is a drastic measure and should be granted only when the moving party's right to judgment is "clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). To determine whether there is a genuine issue of material fact, we construe the pleadings, depositions, admissions, and affidavits strictly against the moving party and liberally in favor of the opponent. *Id.* at 131-32. " 'On appeal from an order granting summary judgment, a reviewing court must consider whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether summary

judgment is proper as a matter of law.' " *Becker v. Alexian Brothers Medical Center*, 2021 IL App (1st) 200763, ¶ 12 (quoting *Monson v. City of Danville*, 2018 IL 122486, ¶ 12). If reasonable people would draw divergent inferences from undisputed facts, summary judgment must be denied. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). We review the circuit court's decision on a motion for summary judgment *de novo*. *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 14.

¶ 39    To state properly a cause of action for negligence, a plaintiff must establish that the defendant owed him or her a duty of care, that there was a breach of that duty by the defendant, and that the plaintiff's injury was proximately caused by the breach. *Marshall v. City of Centralia*, 143 Ill. 2d 1, 6 (1991). "The question of whether the defendant owed the plaintiff a duty of care is a question of law to be determined by the court." *Id*. In the absence of a showing of facts from which the court could infer the existence of a duty to the plaintiff, no recovery is possible as a matter of law, and summary judgment in favor of the defendant is proper. *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 411 (1991).

¶ 40                              B. Duty Under the City Ordinances

¶ 41    Plaintiff first argues that city ordinance § 8-5B-2A created a requirement for property owners to safely maintain their property by restricting the growth of grass from exceeding eight inches. Any growth of grass or weeds exceeding eight inches is declared a nuisance under the ordinance. In addition, city ordinance § 8-5B-2B requires property owners "to cut the grass, weeds or plants located in the area between their property line and the curb line or pavement line of the street abutting or immediately adjacent to their property." City of Geneva Municipal Code § 8-5B-2B (eff. Nov. 7, 2005). Plaintiff contends that this court should interpret the ordinances as public safety measures that created a duty and provided for a civil cause of action for injuries causally

18

related to the nuisance.

¶ 42    In *Thiede*, the plaintiff similarly argued that certain ordinances of the City of Woodstock required the defendants to maintain and repair their driveway where it crossed the public sidewalk. 196 Ill. App. 3d at 257-58. In that case, the defendants were property owners of a house that included a driveway which intersected with the public sidewalk. *Id*. at 255. Photographs of the intersection between the driveway and sidewalk showed that the public walk had disintegrated to the extent that it was comprised of crumbled pavement or gravel. *Id*. At the edge of the driveway where the sidewalk paved surface resumed, a lip or slightly raised portion of pavement had formed. *Id*. The plaintiff was jogging on the sidewalk and had entered the portion of the public walk which crossed the defendants' driveway. After he proceeded across the driveway, his left toe caught the lip of the walk where the pavement resumed. He fell and sustained injuries. *Id*. at 256. The circuit court granted summary judgment in favor of the defendants and against the plaintiff on his negligence claim. *Id*. at 257.

¶ 43    On appeal, the plaintiff argued, among other things, that certain ordinances of the City of Woodstock obligated the defendants to maintain and repair their driveway where it crossed the public sidewalk. *Id*. at 257-58. The plaintiff contended that the defendants' violation of the city's ordinances subjected them to liability for injuries which resulted from their failure to maintain and repair the driveway. As to the issue of whether a legal duty was imposed under the ordinances, this court concluded that the ordinances did "not expressly impose liability on property owners such as defendants for violations of its terms." *Id*. at 259. The *Thiede* court continued, "[a]lthough the purported ordinance specifies the manner in which a driveway is to be constructed and expressly prohibits depressions, obstructions and slippery or hazardous surfaces, nowhere does it explicitly impose liability upon the owner or occupier of such a driveway for injuries to pedestrians which

might result from such depressions, obstructions, or slippery and hazardous conditions." *Id*. In short, a city ordinance must contain "explicit language" imposing liability on property owners or occupiers for violations of its requirements. See *id*.; *cf. Shufelt v. City of Rockford*, 89 Ill. App. 3d 717, 718 (1980) (noting that the city's ordinance contained explicit language imposing liability for failure to repair a defective public sidewalk, specifically stating that, "[s]uch abutting owner or occupier is liable for injuries sustained by lack of repair"). Furthermore, the *Thiede* court found that the city ordinances' purpose was to provide a benefit for the municipality and, therefore, was not a public safety measure. *Id*. at 260.

¶ 44    In this case, the city ordinances at issue contain no express language imposing tort liability for violations of their requirements. In addition, the record supports our conclusion that the purpose of the ordinances was to provide a benefit to the municipality, rather than to ensure public safety. For example, Forni testified that the city amended section 8-5B-2A to limit the growth of vegetation to 8 inches instead of 12 inches for aesthetic reasons. Plaintiff has not demonstrated that the ordinances were enacted for public safety reasons. As in *Thiede*, we conclude that the ordinances at issue were not public safety measures and instead were regulatory ordinances that were enacted to benefit the municipality. 196 Ill. App. 3d at 260; see also *Gilmore v. Powers*, 403 Ill. App. 3d 930, 939 (2010) (finding the municipal ordinance was a regulatory provision intended to benefit the city and did not impose a duty of care); *Klikas v. Hanover Square Condominium Ass'n*, 240 Ill. App. 3d 715, 721 (1992) (concluding that the ordinance did not impose a duty on the defendants to clear the snow and ice and that a violation of the ordinance was not evidence of the defendants' negligence); *Summers v. City of Springfield*, 33 Ill. App. 3d 474, 476 (1975) (holding that an ordinance requiring the abutting landowner to maintain the sidewalk in good repair, but not providing that the "abutter is liable for injury to members of the public" did not

impose tort liability upon abutting landowner). Accordingly, we determine the city ordinances here did not impose a duty of care on defendant as the owner of property abutting the public parkway to mow or cut the grass on the parkway, because they neither explicitly imposed tort liability, nor were enacted to benefit the public.[2]

¶ 45                                    C. Common Law Duty

¶ 46    Plaintiff next argues that defendant owed him a common law duty to refrain from causing a defective condition on the parkway and to repair the defect that it created. According to plaintiff, the parties do not dispute that defendant neglected to maintain and mow the subject parkway for years, as Coleman had admitted in his deposition testimony. Plaintiff argues that this admitted failure to mow caused the hidden defect of the concealed buffalo box. Plaintiff contends that it was not the raised buffalo box alone that caused his injury, but also the un-mowed grass that concealed the buffalo box which led to his injury. Plaintiff insists that this is a genuine issue of material fact for a jury.

¶ 47    Defendant responds that its failure to cut the grass was not an "affirmative act" causing the condition that led to plaintiff's injury. Defendant argues that for a landowner to have a duty to maintain adjacent public property, the landowner must take affirmative action to actually cause the condition that led to the injury.

¶ 48    In Illinois, "[a]lthough a private landowner owes a duty of care to provide a reasonably safe means of ingress and egress from his property, he generally owes no duty to ensure the safe

_____

[2]  It is worth noting that, even if defendant had "complied" with the ordinance by cutting the grass to eight inches in height, the buffalo box raised three inches off the ground would still have been obscured.

condition of a public sidewalk or parkway abutting that property." (Internal citations omitted.) *Gilmore*, 403 Ill. App. 3d at 933; see also *Caracci v. Patel*, 2015 IL App (1st) 133897, ¶ 23. However, a duty may be imposed upon a landowner of abutting municipally-owned property when: (1) the landowner appropriates the public property for his or her own use; (2) the public property is the sole means of ingress and egress to the landowner's property; or (3) the landowner created the defective condition on the public property that interfered with the customary and regular use of the property. *Caracci*, 2015 IL App (1st) 133897, ¶ 23; *Gilmore*, 403 Ill. App. 3d at 933-36; *Thiede*, 196 Ill. App. 3d at 261-62. Here, none of these exceptions apply.

¶ 49                                      1. Appropriation of Public Property

¶ 50    First, Illinois courts have held that in cases when an occupier of premises has appropriated a public sidewalk for its own use, it then has a duty to ensure that the sidewalk is safe. See *Dodd v. Cavett Rexall Drugs, Inc.*, 178 Ill. App. 3d 424, 432 (1988); see also *McDonald v. Frontier Lanes, Inc.*, 1 Ill. App. 3d 345, 352 (1971); *Cooley v. Makse*, 46 Ill. App. 2d 25, 30 (1964). In *Gilmore*, the plaintiff appealed from a circuit court order granting summary judgment in favor of the landowner defendants. She sought recovery for personal injuries she sustained while moving the defendants' personal belongings from a moving van to the defendants' home. *Gilmore*, 403 Ill. App. 3d at 930. The plaintiff alleged that she fell on a stone walkway that straddled the city-owned parkway in front of the defendants' house. *Id.* The plaintiff claimed that the defendants owed her a duty to inspect "their property" for hazardous conditions, permitting the walkway to remain in a dangerous condition, failing to fix the walkway after becoming aware of its dangerous condition, and failing to properly maintain the walkway on the property. *Id.* at 931. She conceded that the walkway was located on a parkway owned by the city, but nevertheless argued that the defendants, as adjacent property owners, owed her a duty of care because "they appropriated the walkway for

their own use by mowing the grass growing upon it, raking leaves from it, and crossing it daily in order to get from the sidewalk to the street." *Id*. at 933.

¶ 51 Although this court agreed with the proposition that an abutting landowner may be responsible for the condition of a public sidewalk or parkway if he assumes control of it for his own purposes, "an assumption of control for purposes of determining duty of care must consist of affirmative conduct which prevents the public from using the property in an ordinary manner such as blocking the land, parking on it, or using it to display goods." *Id*. The plaintiff in *Gilmore* neither alleged nor presented any evidence that the defendants performed any affirmative act to appropriate the use of the walkway on the parkway at issue in that case. *Id*. at 935. The court stated that the defendants "have not blocked the parkway, parked on it, or otherwise prevented the public from using it in an ordinary manner." *Id*. In addition, the court also found unpersuasive the plaintiff's argument that the defendants appropriated the parkway by walking over it or by maintaining it when they cut the grass and raked leaves off of it. *Id*. Indeed, there is "no duty to maintain the city-owned property" when "the landowner merely maintains the property by mowing grass or shoveling and salting [snow] in the winter." *Id*. at 934 (citing *Burke v. Grillo*, 227 Ill. App. 3d 9, 15-16 (1992) and *Evans v. Koshgarian*, 234 Ill. App. 3d 922, 926 (1992)). Simply put, "acts of maintenance are insufficient to show appropriation." *Id*. at 935 (citing *Burke*, 227 Ill. App. 3d at 15-16 (no appropriation where the defendants merely mowed grass and shoveled snow where hole that caused the injury was located); *Evans*, 234 Ill. App. 3d at 926 (no assumption of control over public parkway even though abutting property owner gratuitously swept, shoveled, or salted it). The *Gilmore* court held that no duty existed requiring the defendants to maintain the walkway at issue in a safe condition as a matter of law and, therefore, the circuit court appropriately granted summary judgment in the defendants' favor. *Id*. at 941.

¶ 52    Defendant here did not take any affirmative steps to appropriate the parkway in this case such as blocking it, parking on it, using it to display goods, or otherwise preventing the public from using it in its ordinary manner. *Gilmore*, 403 Ill. App. 3d at 935; *Evans*, 234 Ill. App. 3d at 926. Hahn, who has rented the storefront at 303 Franklin since 2002, described the public's use of the parkway, stating that "people walk their dogs there, obviously, and the kids are always running around." Neither plaintiff nor any of the witnesses deposed testified that defendant appropriated the parkway in any manner. In sum, there is no evidence of affirmative conduct on the part of defendant that prevented the public from using the parkway where plaintiff fell.

¶ 53                    2. Sole Means of Ingress and Egress

¶ 54    Next, plaintiff argues that defendant owed him a duty to provide a safe means of ingress and egress to the property when he parked his car next to the public parkway, citing *Smith v. Rengel*, 97 Ill. App. 3d 204 (1981) in support of his contention. *Smith*, a decision in this court's Fourth District, found that a landlord's claimed actions in shoveling snow from and filling holes in a public parkway in front of the landlord's property was sufficient to give rise to a duty to maintain the parkway in a reasonably safe condition. *Id.* at 206. The court held that the defendant's wife and son mowed the grass and shoveled the snow from the parkway, and that such evidence of control was "sufficient to raise a duty in law on the adjacent landowner to use ordinary care to maintain the boulevard in a reasonably safe condition for his tenants and their invitees and social guests." *Id.* However, the *Gilmore* court noted that the First and Second Districts have both rejected the holding in *Smith* as unpersuasive and overbroad. See *Gilmore*, 403 Ill. App. 3d at 935-36; see also *Evans*, 234 Ill. App. 3d at 936 (First District) and *Burke*, 227 Ill. App. 3d at 15-16 (Second District).

¶ 55    Moreover, *Smith* is inapplicable here, as plaintiff never pleaded in his amended complaint

24

or argued in any proceeding below or in his brief on appeal, that defendant, as the landlord of the premises, owed a duty to plaintiff as its tenant. Thus, he has forfeited this argument. See *Helping Others Maintain Environmental Standards v. Bos*, 406 Ill. App. 3d 669, 695 (2010) ("Generally, a party who does not raise an issue in the trial court forfeits the issue and may not raise it for the first time on appeal.").

¶ 56    In *Dodd*, the plaintiff fell on a public sidewalk outside the defendant's store in a shopping center. The plaintiff argued that because the sidewalk was used for ingress and egress from the store, the defendant owed a duty of care to ensure that the sidewalk was in a safe condition. This court rejected the plaintiff's argument and held that the defendant had not performed any affirmative act of appropriation over the sidewalk where the plaintiff was injured and, therefore, owed no such duty of care. *Dodd*, 178 Ill. App. 3d at 433. The court specifically noted that the sidewalk was not the only means of ingress and egress to the store and that the sidewalk was open to the general public. *Id*.

¶ 57    In contrast to *Dodd*, the brick walk where the plaintiff sustained injury in *Cooley* was the sole means of ingress and egress to the defendant's tavern. *Cooley*, 46 Ill. App. 2d at 30-31. There, the plaintiff fell over some loose bricks from a brick walk leading from concrete steps at the front door of a tavern located 18 feet away from the city sidewalk. The location where the plaintiff fell occurred upon a municipally-owned easement. The parties did not dispute the defective condition of the walk at the time of the incident or that the walk had been in poor condition for a number of years. The Second District found that the brick walk was exclusively used by those entering and exiting the tavern. *Id*. Although the walk was located on a city easement, the general public did not traverse its path. *Id*. at 28. The court found that the defendants had a duty to illuminate the brick walk properly and to give adequate warning of the dangerous condition, or to repair the walk,

even though the walk was not affirmatively created by either the owner or operator of the tavern. *Id.* at 31-32.

¶ 58　In this case, the parkway where plaintiff's injury occurred is used by the general public and plaintiff has not demonstrated that use of the parkway was the sole means of ingress and egress to his residence. Indeed, plaintiff himself testified that in the more than 6 years he resided at that address, he did not use the parkway even once until the night that he tripped and fell. Accordingly, *Cooley* and similar cases are inapplicable here. We hold there was no duty to maintain the parkway at issue in this case considering that it was not the sole means of ingress and egress to plaintiff's apartment.

¶ 59　　　　　　　　　　　3. Creation of Defective Condition

¶ 60　Now turning to the issue of whether defendant landowner created the defective condition on the public property, plaintiff argues that the hidden defect in the parkway was at least partially caused by defendant's negligent failure to mow and maintain the parkway. Plaintiff contends that defendant owed a duty to not create a hidden safety hazard on the subject parkway by obscuring the buffalo box upon which he tripped and fell. He argues that his injury was easily foreseeable due to the trip hazard and more likely due to the ongoing lack of maintenance of the parkway. Plaintiff insists that *Thiede* controls this case.

¶ 61　The *Thiede* court stated the general rule that "a landowner's or occupier's nonliability for repairs to a public sidewalk does not relieve the owner or occupier from his responsibility to pedestrians for 'personal injuries sustained as a proximate result of the dangerous condition of a sidewalk adjoining his property when the dangerous condition was *directly occasioned by him*.' " (Emphasis added.) 196 Ill. App. 3d at 261 (quoting 9 Ill. L. & Prac. *Cities, Villages & Other Municipal Corporations* § 536, at 127-28 (1954)). Plaintiff in this case essentially argues that

defendant's negligence stemmed from an omission, *i.e.*, the failure to mow the grass or maintain the parkway, rather than actively creating a dangerous condition.

¶ 62    In *Thiede*, this court found that the plaintiff presented sufficient evidence of whether the defendant landowner caused or contributed to the defective condition of the public sidewalk. The court stated that the record contained several photographs showing the deterioration of the sidewalk where it intersected with the defendants' driveway. The plaintiff submitted affidavits attesting to "the high volume of traffic on defendants' driveway and to the constant deterioration of the driveway and sidewalk." *Id*. at 263. The court reasoned that, "[a]lthough plaintiff improperly offered one affiant's conclusion that the traffic on defendants' driveway caused the damage to the driveway and sidewalk, this inference can clearly be drawn from the facts set out above." *Id*. In addition, there was sufficient evidence in the record to support an inference that the persons using the sidewalk and driveway did so with the defendants' knowledge and permission. *Id*. The court concluded that the facts and record, "when viewed in the light most favorable to plaintiff, support[ed] the conclusion that defendants owed a duty to plaintiff to refrain from causing a defective condition in the sidewalk and to repair such defects; further, defendants' liability to plaintiff for his injuries resulting from damage occasioned by defendants may similarly be inferred." *Id*. In short, the *Thiede* court reversed the circuit court's summary judgment finding based on evidence presented that high traffic volume caused the damage to the defendants' driveway and intersecting public sidewalk, for which defendants' duty to maintain and repair arose. *Id*.

¶ 63    Significantly for purposes of this disposition, the defendant landowners in *Thiede* owned two apartments on the property and the driveway provided access to and parking for the property. Thus, ingress and egress to the property necessitated use of the driveway that crumbled due to the

defendants' lack of maintenance and repair.

¶ 64    In this case, the parties do not dispute the condition of the public parkway. The duty owed by an owner or occupier of land abutting a city-owned parkway is no different than the duty owed if the premises in question were a city-owned sidewalk. See *Evans*, 234 Ill. App. 3d at 925; *Burke*, 227 Ill. App. 3d at 17. The parties do not dispute that the grass and weeds on the public parkway remained un-mowed for extended periods and that Coleman admitted that he was responsible for maintaining the parkway, but failed to do so. Coleman also testified that he had not contracted with a company to mow the parkway prior to plaintiff's fall.

¶ 65    Here, the undisputed evidence still does not give rise to defendant's duty to maintain the public parkway in light of the way he tripped and fell. Plaintiff alleged in his amended complaint that he was injured "when he tripped on the concealed and raised water valve or curb stop and fell to the ground." Plaintiff did not fall because the grass was un-mowed. He fell because his foot allegedly got caught underneath the city's raised buffalo box, which hazard was not actively created by defendant. The record evidence shows that the city installed, owned, and maintained the buffalo box at issue. Furthermore, plaintiff presented no evidence demonstrating that defendant was responsible for raising the buffalo box up three inches from the ground. Simply put, there is no evidence to support the creation of the defective condition by defendant. Requiring this defendant to be legally responsible for a defect owned, installed, and maintained by the city, and located on the city's property is unreasonable and in contravention of established premises liability precedent.

¶ 66    In short, for liability to be imposed, a landowner must perform *some affirmative act* in creating an unsafe condition or obstruction or in asserting control over a sidewalk. *Dodd*, 178 Ill. App. 3d at 433 (finding no evidence that the defendant performed any affirmative act to assert

control over the sidewalk where the plaintiff was injured); *Thiede*, 196 Ill. App. 3d at 261 (holding that a duty to repair an abutting public sidewalk arises when personal injuries sustained as a proximate result from the sidewalk's dangerous condition were "directly occasioned" by the defendant). That did not occur here. We hold that, as a matter of law, defendant owed no duty to plaintiff for the injuries he sustained because they were not "directly occasioned" by defendant's failure to mow the grass or maintain the parkway.

¶ 67    The decision in *Hollenbeck v. City of Tuscola*, 2017 IL App (4th) 160266, further bolsters our conclusion. There, the plaintiff claimed she sustained injuries after she stepped in a depression located on a public parkway that was covered with grass, leaves, and debris, obscuring a catch basin underneath, which caused her to fall. The plaintiff alleged in her complaint that, Kinney, the defendant homeowner whose property abutted the public parkway, "had a duty to exercise ordinary care when he undertook mowing and yard maintenance" of the parkway. *Hollenbeck*, 2017 IL App (4th) 160266, ¶ 6. The plaintiff argued, among other things, that Kinney violated the local ordinance by allowing the grass he maintained to be in excess of eight inches and that he "caused large clumps of grass to be cut, which covered the catch basin cover and 'camouflaged or covered it with excessive thick coverings of dead and mowed grass, rendering the existence of the cover to be invisible to the naked eye.' " *Id.* The evidence established that the City of Tuscola owned the public parkway and that the catch basin was also owned and maintained by the city. *Id.* ¶¶ 8, 11. Kinney testified by deposition that "a neighbor would mow the lawn as needed," but he "never removed any leaves to clear the drain because 'it's the city's property, not mine.' " *Id.* ¶ 16. The circuit court granted summary judgment in favor of both Kinney and the City of Tuscola.

¶ 68    On appeal, the plaintiff argued that Kinney breached his duty to exercise ordinary care "when he undertook mowing and yard maintenance on city property and, in doing so, rendered the

existence of the catch basin to be invisible to the naked eye." *Id.* ¶ 46. The reviewing court found that "no evidence indicated Kinney assumed any portion of the parkway for his own purposes as a means of ingress or egress," and "nothing indicated Kinney prevented the general public from using the parkway in any fashion." *Id.* ¶ 47. Further, the court concluded that, although Kinney mowed the parkway or that someone mowed it on his behalf, "these acts of maintenance fail to establish a duty on Kinney's part." *Id.* Indeed, the plaintiff agreed that Kinney had no duty to mow the parkway. *Id.* ¶ 48. She argued, however, that once Kinney decided to do so, he had a duty to exercise ordinary care respecting her safety and well-being. *Id.*

¶ 69　　The *Hollenbeck* court noted the plaintiff's deposition testimony, which failed to show the presence of "large clumps of grass" on the catch basin cover. Instead, the plaintiff "testified she stepped on leaves and what she '*assumed* was grass because the grass was high.' " (Emphasis added.) *Id.* ¶ 50. The photographic evidence confirmed the presence of leaves, but nothing indicated the catch basin lid was covered with dead and mowed grass. *Id.* The court found that the plaintiff's deposition testimony amounted to a judicial admission to which she was bound. The court concluded that the evidence failed to show the existence of large clumps of grass obscuring the catch basin cover and that the plaintiff's attempt to create a genuine issue of material fact was "nothing more than speculation." *Id.*

¶ 70　　Here, similar to *Hollenbeck*, plaintiff's deposition testimony amounted to a judicial admission when he specifically acknowledged he never looked down at the grass which allegedly obscured the buffalo box that caused him to trip and fall. Indeed, considering plaintiff's judicial admission, the height of the grass is immaterial to this case. "If the admission amounts to a judicial admission, it is binding upon the party, and it may not be controverted." *Burns v. Michelotti*, 237 Ill. App. 3d 923, 932 (1992).

¶ 71    Thus, even assuming, *arguendo*, that defendant owed a duty to mow the grass, summary judgment was appropriate because there was no disputed genuine issue of material fact that defendant's alleged breach of duty, the failure to mow the lawn, proximately caused plaintiff to fall, given plaintiff's counterfactual judicial admission. Further, the police report compiled immediately after the occurrence stated that, "[t]he valve in question is painted blue and the grass around it had not been mowed. It, however, is visible." Indeed, plaintiff himself agreed during his deposition that the police photograph accurately depicted the parkway after the occurrence, showed that the buffalo box had blue paint on it, and was "clearly visible in the photograph." Plaintiff in this case simply failed to look down. We are bound by his judicial admission and cannot contradict it. *Hollenbeck*, 2017 Il App (4th) 160266, ¶ 50 (citing *Eidson v. Audrey's CTL, Inc.*, 251 Ill. App. 3d 193, 195-96 (1993)).

¶ 72    Plaintiff essentially provided a conclusory argument, without evidentiary support, that there is a genuine issue of material fact as to whether defendant owed a duty because the grass on the parkway was un-mowed and he fell. "A party cannot create a factual dispute by contradicting a previously made judicial admission." *Burns*, 237 Ill. App. 3d at 932 (citing *Hansen v. Ruby Construction Co.*, 155 Ill. App. 3d 475, 480 (1987)). The evidence in this case shows that, although there was tall, un-mowed grass on the subject parkway, its presence was inconsequential to what actually caused plaintiff to trip and fall. Plaintiff admitted he was not looking downward at the tall grass that allegedly obscured the buffalo box, which he also acknowledged was "clearly visible" in a police photograph depicting the parkway where he fell shortly after the occurrence.

¶ 73    Accordingly, construing the pleadings, depositions, admissions, and affidavits strictly against defendant and liberally in favor of plaintiff, as we must, we hold that summary judgment was properly granted in favor of defendant.

¶ 74                                  III. CONCLUSION

¶ 75    We affirm the judgment of the circuit court of Kane County.

¶ 76    Affirmed.